UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SCOTT R. WEISBERG, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action Number |
| ) | 2:16-cv-00568-AKK |
| GUARDIAN LIFE ) | |
| INSURANCE COMPANY OF ) | |
| AMERICA, et al., ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This case arises out of a dispute between Scott R. Weisberg, M.D., and his disability insurance provider, The Guardian Life Insurance Company of America ("Guardian"),[1] regarding long-term disability insurance benefits. Dr. Weisberg's insurance policy with Guardian provided coverage for total disability and for "residual disability," defined by the policy as, at least, a 20% reduction in income caused by injury or illness. Dr. Weisberg alleges that because he presented a valid claim for both total and residual disability benefits, Guardian's refusal to pay breached the parties' contract. Dr. Weisberg further alleges that Guardian acted in bad faith by failing to investigate his disability claim, and by failing to pay the benefits he alleges he is entitled to under the policy.

---

[1] Dr. Weisberg also names Berkshire Life Insurance Company of America, a wholly-owned subsidiary of Guardian, as a defendant, but, for ease of reference, this court will treat Guardian as the sole defendant in this case.

1

The court is now confronted with the parties' cross-motions for summary judgment. Docs. 41; 49. Dr. Weisberg seeks summary judgment only with respect to his breach of contract and bad faith claims pertaining to Guardian's denial of residual disability benefits. Guardian seeks summary judgment on all the bad faith claims Dr. Weisberg asserts. Both parties' motions are now fully briefed, docs. 41; 49; 62; and 65, and ripe for review. Based on careful consideration of the parties' arguments and the record, this court finds that summary judgment in favor of Guardian is due to be granted on all of Dr. Weisberg's bad faith allegations. However, issues of material fact preclude summary judgment on Dr. Weisberg's breach of contract claim related to residual disability. Accordingly, Dr. Weisberg's motion for partial summary judgment, doc. 41, is due to be denied, and Guardian's motion for partial summary judgment, doc. 49, is due to be granted.

## **II. STANDARD OF REVIEW**

Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. Indeed, it is explicitly not the role of the court to "weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Anderson*, 477 U.S. at 255 (explaining "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Nor will "a . . . 'scintilla of evidence in support of the nonmoving party . . . suffice to overcome a motion for summary judgment.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)).

The simple fact that both sides have filed a motion for summary judgment does not alter the ordinary standard of review. *See Chambers & Co. v. Equitable Life Assurance Soc.*, 224 F.2d 338, 345 (5th Cir. 1955) (explaining that cross-motions for summary judgment "[do] not warrant the granting of either motion if the record reflects a genuine issue of fact"). Rather, the court will consider each motion separately "'as each movant bears the burden of establishing that no

genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017) (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004)). The court notes that although cross-motions "'may be probative of the non-existence of a factual dispute'" they "'will not, in themselves, warrant [the granting of] summary judgment.'" *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

## III. FACTS

Dr. Weisberg, a board certified family physician and the former owner of Homewood Family Medicine, purchased a long-term disability insurance policy from Guardian. Docs. 41 at 2; 49 at 3. The policy included a rider allowing Dr. Weisberg, at his option, to purchase additional disability insurance. Doc. 49 at 3. Dr. Weisberg exercised that option and subsequently purchased additional coverage from Berkshire, a wholly owned subsidiary of Guardian. *Id.* The original Guardian policy provided for a total disability benefit of $7,500 a month, and the Berkshire policy provided an additional total disability benefit of $3,650 a month. *Id.* Otherwise, the policy provisions at issue here are substantively identical. *Id.*; Doc. 41 at 3.

Under the policies, "total disability means that, because of sickness or injury, you are not able to perform the major duties of your occupation." Doc. 49 at 3. The policies define occupation as "the regular occupation . . . in which you are engaged at the time you became disabled." *Id.* Even if the insured is able to work in some other occupation, the insured is still considered totally disabled if they "are not able to work in [their] own occupation." *Id.* at 4. In the event an injury or sickness impacts the insured's ability to work but does not result in total disability, the policies also include "residual disability" coverage. *Id.* Residual disability means "that you are at work and are not totally disabled under the terms of this policy, but because of sickness or injury your loss of income is at least 20% of your prior income." Doc. 41 at 3.

*A. The 2013 Disability Claim*

On April 15, 2013, Dr. Weisberg had just completed the Boston Marathon when two bombs exploded nearby. *Id.* at 2, 4. Dr. Weisberg was not struck by any debris, and he did not seek medical treatment at the scene. *Id.* at 4; Doc. 49 at 5. Instead, he returned home to Birmingham and resumed work as scheduled two days later. Doc. 41 at 4. That day, or shortly thereafter, Dr. Weisberg began experiencing a sensation of fullness in his ears accompanied by a loss of hearing in his left ear. *Id.* These symptoms led Dr. Weisberg to visit his family physician, Dr. Raymond Browne, where he reported both the hearing loss and some trouble

5

with maintaining concentration. *Id.* Dr. Browne advised Dr. Weisberg to see a specialist if he continued to have trouble with his hearing. Doc. 49 at 9. Dr. Weisberg did so in June 2013when he made a series of appointments with Dr. Sheldon Black, an Otolaryngologist ("ENT"),[2] again complaining of hearing loss in his left ear. *Id.* at 9–10; Doc. 53-17 at 14.

On September 3, 2013, Guardian received Dr. Weisberg's initial claim for long-term disability benefits based solely on hearing loss. Doc. 53-30 at 2–3, 7. Dr. Weisberg claimed that his hearing loss prevented him from performing auscultation, a medical procedure in which a physician listens to sounds produced by the patient's internal organs, primarily the heart and lungs, in order to make diagnoses. *Id.* at 6–7; Doc. 53-4 at 34. Because his practice required him to routinely perform this procedure, he asserted his loss of hearing was sufficient to qualify as a disability. Docs. 53-4 at 34–36, 65; 53-30 at 7.

After filing his disability claim, Dr. Weisberg continued to seek treatment from Dr. Black and also began seeing Dr. Michael McKenna, another ENT. Docs. 53-4 at 44; 49 at 10; 53-21 at 3. By this time, Dr. Weisberg was reporting hearing losses in both ears. *See* Docs. 53-18 at 2; 53-36 at 2. However, neither Dr. Black nor Dr. McKenna reached a definitive diagnosis of the condition, or even agreed on the extent of Dr. Weisberg's injuries. *See* Docs. 53-20 at 2; 53-17 at 11; 53-21

---

[2] A physician specializing in the disorders and diseases of the ear, nose, and throat. *See* Webster's Third New International Dictionary 1599 (3d ed. 1976)

6

at 1–2.³ Dr. Weisberg does not dispute that his audiograms and other diagnostic tests produced inconsistent, "fluctuating" results. Doc. 41 at 8.

To investigate Dr. Weisberg's disability claim, Guardian gathered Dr. Weisberg's medical records and provided them to Dr. John Holbrook for review. Doc. 49 at 14.⁴ After review, Dr. Holbrook concluded that "[Plaintiff] is not significantly impaired with respect to hearing loss and his ability to perform auscultation in the practice of family medicine." Doc. 53-32 at 17. Dr. Holbrook also suggested that Guardian seek out a hearing specialist to review Dr. Weisberg's medical records further. *Id.* at 12; Doc. 49 at 15. Consequently, Guardian provided the records to Dr. Alexander Arts, an ENT affiliated with the University of Michigan. Doc. 49 at 15. Dr. Arts ultimately concluded that the records he reviewed "[did] not support the presence of a hearing loss." Doc. 53-22 at 3.

Guardian also examined Dr. Weisberg's financial records to determine whether his purported hearing loss entirely prevented him from working or had otherwise resulted in an income reduction of at least 20%. Doc. 49 at 17–18. This inquiry required an investigation into Dr. Weisberg's income levels both before

---

³ In December 2013, Dr. Weisberg also sought a diagnosis from Dr. Rick Love. Doc. 49 at 11–12. Dr. Love was also unable to reach a diagnosis or otherwise arrive at a definitive medical conclusion regarding the scope of Dr. Weisberg's injuries. Doc. 41-13 at 12–13, 41–42.

⁴ Dr. Holbrook is a board-certified physician in internal medicine. Doc. 49 at 14. Guardian purports that Dr. Holbrook's review process is truly independent, but the record reflects his office is actually located in a Guardian facility and most of his income is derived from reviewing medical records as a consultant for Guardian. Doc. 62 at 11. For purposes of summary judgment, however, Dr. Holbrook's independence, or lack thereof, is legally insignificant.

7

and after his injury. *Id.* Although Dr. Weisberg claims that his hearing loss impacted his bottom line and his ability to maintain his practice by forcing him to rely on medical students to perform auscultation, doc. 53-4 at 34–36, 61–62, the financial information reviewed by Guardian indicated that Dr. Weisberg's average monthly income for the period from April 2013 through October 2013 was "6% greater compared to [his] average monthly income for 2012 and 33.86% greater compared to [his] monthly average income for 2011." Doc. 53-38 at 4. For the time period running from April 2013 through December 2013, Dr. Weisberg showed a 12% increase in procedures not requiring a stethoscope over the previous year, although the amount charged for these procedures did decline by 9.7%. *Id.* at 3–4. Dr. Weisberg's billing information also reflected a total decrease of about 7.5% in procedures requiring a stethoscope between April and December 2013, as compared to the previous year, although some months actually showed an increase in volume and charges for these procedures. *Id.* at 3. Based on the results of its investigation into Dr. Weisberg's income levels, and a comprehensive review of his provided medical records, Guardian denied Dr. Weisberg's disability claim, in its entirety, on March 6, 2014. *Id.* at 2.[5]

---

[5] Almost two years later, and shortly before he filed this lawsuit, Dr. Weisberg appealed the denial of his claim. Docs. 49 at 26; 53-41 at 2. Guardian ultimately denied that appeal on July 17, 2017. Doc. 63-5 at 2. Because Dr. Weisberg did not move to amend his complaint following this second denial, that matter is not before this court and Dr. Weisberg's evidence related to his appeal of the 2014 decision will not be considered. *See State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 259 (Ala. 2013) (emphasizing that the relevant inquiry for a bad faith claim is

## IV. DISCUSSION

Neither party asserts that summary judgment is appropriate with respect to Dr. Weisberg's breach of contract claim related to total disability benefits. Instead, Dr. Weisberg moves for summary judgment solely regarding his breach of contract and bad faith claims related to residual disability benefits. Guardian contests this motion and requests summary judgment in its favor on all of Dr. Weisberg's bad faith claims. The court will first address whether Guardian breached Dr. Weisberg's insurance contract by denying his claim for residual disability benefits before turning to the bad faith claims.

### A. Breach of Contract—Residual Disability Benefits

In Alabama, to prevail on a breach of contract claim, the plaintiff must prove: "(1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995). The only one of these elements presently in dispute is whether Guardian adequately performed its obligations under the insurance policy. Dr. Weisberg asserts that he has an injury or illness recognized by Guardian,

---

whether a "reasonably debatable" reason existed for denying the claim at the time of denial); *see also Stephens v. Creel*, 429 So. 2d 278, 280 (Ala. 1983) (noting the established principle that "plaintiffs' cause of action . . . [accrues] when the contract is breached").

Meniere's Disease,[6] and that Meniere's caused him to experience a reduction in income of at least 20%. Accordingly, Dr. Weisberg asserts he qualifies for residual disability benefits under the policy. *See* Doc. 41 at 3 (providing that the insured qualifies for residual disability if "because of sickness or injury [the insured's] loss of income is at least 20% of [the insured's] prior income"). Guardian counters that Dr. Weisberg does not have an illness or injury, and, even if he did, his impairment is not significant enough to have resulted in a 20% reduction in income.

As an initial matter, Dr. Weisberg primarily relies on his diagnosis of Meniere's Disease, which he argues is undisputed, as the basis for his claim for residual disability benefits. *Id.* at 12.[7] However, the record shows that Dr. Weisberg was first diagnosed with Meniere's months after Guardian denied his claim. *Id.* at 9–10; Doc. 41-15 at 6–9. Despite this undisputed fact, Dr. Weisberg argues that Guardian had notice of this issue because some of the medical notes in his file indicated that his symptoms during 2013 suggested the presence of Meniere's. Doc. 41 at 7 n.5.[8] This contention, however, is of no help to Dr. Weisberg because his initial insurance claim never mentioned Meniere's and

---

[6] Meniere's disease is characterized by a set of episodic symptoms including, among other things, hearing loss and severe episodes of vertigo. Doc. 41-15 at 8.

[7] Dr. Weisberg admits that issues of material fact exist with respect to whether he is entitled to claim disability benefits on the basis of his purported cognitive impairments. Doc. 41 at 14. Thus, this court will not address that basis for a disability finding here.

[8] The court notes that although the medical records from this time period do mention Meniere's disease, the treating physicians discount it as a possible diagnosis. *See* Doc. 53-21 at 2–3.

instead identified hearing loss as the sole basis for disability. Doc. 53-30 at 2, 6–7. As such, Meniere's could not have provided a basis for Guardian to find that Dr. Weisberg qualified for residual disability at the time he filed his insurance claim.[9]

This court's review of the extensive record clearly reveals that, at the time Dr. Weisberg's initial claim for disability benefits was denied, Guardian disputed both the existence and severity of Dr. Weisberg's illness or injury. Dr. Holbrook,

---

[9] Under Alabama law "[i]t is well settled that a cause of action for breach of contract accrues when the contract is breached." *Wheeler v. George*, 39 So. 3d 1061, 1084 (Ala. 2009). Here, Guardian denied Dr. Weisberg's claim for disability benefits, purportedly breaching the parties' insurance contract, in March 2014. Doc. 49 at 19. Therefore, the additional facts and allegations related to Dr. Weisberg's appeal of that determination, which Guardian ultimately rejected in 2017, are not properly before the court. *See supra* note 5. Dr. Weisberg does not argue that Guardian's failure to pay disability benefits is a continuing breach, and the court has not located any Alabama case law addressing the question. The majority view appears to be that in an action to determine a basic entitlement to benefits, like this one, there is only a single potential breach stemming from the insurer's initial determination of ineligibility. *See, e.g.*, *Dinerstein v. Paul Revere Life Ins. Co.*, 173 F.3d 826, 828–29 (11th Cir. 1999) (applying Florida law to conclude that continuing breach theory is inapplicable to a contract suit premised on defining "the rights and obligations of the parties under the original insurance contract"); *Curry v. Trustmark Ins. Co.*, 600 F. App'x 877, 880–81 (4th Cir. 2015) (applying Maryland law to conclude that continuing breach theory does not apply to an insurer's initial determination that a claimant is not eligible for disability benefits); *Wetzel v. Lou Ehlers Cadillac Grp. Long Term Disability Ins. Program*, 222 F.3d 643, 650 (9th Cir. 2000) (drawing a basic distinction between denial of an initial entitlement to benefits and the denial of an entitlement to recover particular periodic benefit distributions); *Lang v. Aetna Life Ins. Co.*, 196 F.3d 1102, 1105 (10th Cir. 1999) (concluding under Utah law that disability insurance policies were not installment contracts susceptible to a continuing breach theory of accrual). And, the Eleventh Circuit has instructed that it is appropriate to assume "that Alabama courts would adopt the majority view on a legal issue in the absence of indications to the contrary," as is the case here. *Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1304 (11th Cir. 2017). Therefore, the second denial could not have constituted a breach of contract until it occurred. Thus, the second denial of benefits has no bearing on Guardian's initial claims decision, and, in any event, it is not directly encompassed by Dr. Weisberg's Complaint because the denial did not occur until the summary judgment stage of this proceeding. *See* Doc. 63-5 at 2 (denial letter dated July 17, 2017, subsequent to the filing of the cross-motions for summary judgment before the court now). As such, the denial of Dr. Weisberg's appeal is not before the court, and, even if it were, it is irrelevant to the disposition of this motion.

who initially assessed Dr. Weisberg's disability claim for Guardian, concluded that Dr. Weisberg was "not significantly impaired" and that his purported hearing loss did not interfere with the essential functions of his practice. Doc. 53-32 at 17. An ENT specialist, Dr. Arts, who also reviewed Dr. Weisberg's medical records, went even further, finding that the records did "not support the presence of a hearing loss." Doc. 53-22 at 3. On the other hand, Dr. Weisberg testified that he had significant hearing difficulties, and that he could not perform auscultations at all. Doc. 53-4 at 34–36. This account is corroborated by at least some of the auditory testing he underwent during 2013. Although the results of these tests fluctuated, at least some level of hearing loss was suggested, particularly with regards to word discrimination tests which were sometimes so low as to be "incompatible with communication." Docs. 53-22 at 2–3; 53-23 at 5–6, 27; 53-17 at 8. This conflicting testimony presents a textbook dispute of material fact over whether Dr. Weisberg had an injury or illness that would have qualified him for residual disability under the terms of Guardian's policy at the time he was first denied coverage.

Similarly, Guardian's investigation into Dr. Weisberg's finances shows that questions of material fact remain over whether Dr. Weisberg suffered the requisite loss of income to qualify for residual disability. Guardian presents evidence indicating that after Dr. Weisberg's purported injury he was performing more

procedures not involving auscultation than before the injury, and that between April and October of 2013 his monthly income actually rose significantly. Doc. 53-38 at 3–4. Further, it is undisputed that at the time Guardian denied Dr. Weisberg's claims in 2014 he was still working full-time in his personal medical practice. Docs. 41 at 5; 49 at 25. Contrary to Dr. Weisberg's contentions, rather than establishing that he is due to prevail as a matter of law, his testimony that he was almost entirely precluded from performing auscultations, that he was forced to rely on students to perform this critical aspect of his practice, that he was much less efficient in his work, that he could not handle the same volume of patients following his injury, and that his practice experienced substantial decreases in billing and income after December 2013, simply creates a genuine issue of material fact regarding whether, at the time of his application for disability benefits, he had suffered the requisite 20% loss in income. Doc. 53-4 at 34–36, 61–62.

Because questions of material fact exist regarding whether Dr. Weisberg was injured and whether he met the income loss requirements for residual disability eligibility, summary judgment is not appropriate with respect to Dr. Weisberg's breach of contract claim based on Guardian's initial denial of his claim for residual disability. Accordingly, Dr. Weisberg's motion is due to be denied.[10]

---

[10] Even if the court were to consider Dr. Weisberg's subsequent diagnosis of Meniere's Disease, it would not result in a grant of summary judgment in his favor. Guardian has put forward significant evidence disputing that diagnosis. For example, Dr. Arts disagreed with the

*B. Bad Faith*

Alabama law recognizes a single tort of bad faith for an insurer's intentional refusal to settle a direct insurance claim "'when there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 7 (Ala. 1981)). A bad faith claim involving the insurer's refusal to pay benefits requires proof of "(a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, [and] (d) the insurer's knowledge of such absence." *Id.* at 258. However, a bad faith claim involving the insurer's failure to investigate requires proof of a conditional fifth element—"the insurer's intentional failure to determine whether

---

Meniere's diagnosis and thought it was "flawed on many levels." Doc. 53-53 at 3, 5. Dr. Arts supported this conclusion based on his comprehensive review of the medical records, and the substantive limitations of the diagnostic testing used to make the initial Meniere's diagnosis. *Id.* at 2–3. It is also apparent that the medical records that Dr. Weisberg submitted in support of his appeal continued to show substantial fluctuations in hearing and, as Dr. Holbrook determined, "continue[d] to support a conclusion that the claimant [was] not significantly impaired with respect to hearing loss and his ability to perform auscultation." Doc. 63-5 at 5. As Guardian points out, despite years of testing and physician's visits, Dr. Weisberg relies almost entirely on the opinion of a single doctor, Dr. McFeely, to substantiate his diagnosis of Meniere's Disease. Doc. 41 at 8–12. Further, to the extent Dr. Weisberg alleges a myriad of cognitive issues as an additional basis of disability in his appeal, he admits that questions of material fact exist regarding their existence and severity. Doc. 41 at 14. Accordingly, the new evidence pertaining to Dr. Weisberg's appeal and Guardian's subsequent denial of his renewed claim in 2017 would not alter the court's analysis even if this new evidence was properly before the court.

there is a legitimate or arguable reason to refuse to pay the claim." *Id.* (quoting *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982).[11]

In either event, "if a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith." *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981); *see also Brechbill*, 144 So. 3d at 259 (holding that "*regardless of the imperfections of* [*the insurer's*] *investigation*, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim") (quotations omitted). Thus, all that is required for the insurer to avoid bad faith liability is "'a legitimate or arguable reason for refusing to pay [the insured]'s claim.'" *Brechbill*, 144 So. 3d at 257 (quoting *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 774 (Ala. 1990); *see also Bowen*, 417 So. 2d at 185 (explaining that if plaintiff fails to prove the nonexistence of "any fairly debatable reason on a matter of fact or a matter of law, [s]he cannot recover under the tort of 'bad faith refusal'"). "When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." *Davis v. Cotton States Mut. Ins. Co.*, 604 So. 2d 354, 358–59 (Ala. 1992).

---

[11] Because a bad faith tort claim based on the insurer's failure to investigate requires proof of this conditional fifth element, it is sometimes referred to as the "abnormal" case as opposed to the "normal" version of the tort based on the insurer's failure to pay a claim. *See Brechbill*, 144 So. 3d at 258.

Indeed, the plaintiff's burden is so heavy with respect to proving the absence of a debatable reason for refusal that "in the 'normal' case, a plaintiff's bad-faith claim may not be submitted to the jury unless she shows that she is entitled to a directed verdict on the contract claim." *Alfa Mut. Fire Ins. Co. v. Thomas*, 738 So. 2d 815, 822 (Ala. 1999). Federal courts in this circuit have also frequently recognized the significant hurdles a plaintiff must overcome to prevail against an insurer on a bad faith tort claim. *See, e.g.*, *Bailey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 1:12-cv-4206-KOB, 2015 WL 1883725, at *8 (N.D. Ala. Apr. 24, 2015) (finding that "an arguable basis" for denying a claim was sufficient to defeat bad faith liability for both failure to pay and failure to investigate); *Ala. Gas Corp. v. Travelers Cas. & Sur. Co.*, 990 F. Supp. 2d 1154, 1162 (N.D. Ala. 2013) (explaining that under Alabama law all an insurer requires is "an arguable basis" for denying a claim to defeat bad faith liability).

As extensively discussed above, Dr. Weisberg's breach of contract claim for Guardian's failure to pay residual disability benefits is permeated with disputes of material fact regarding both the existence of an illness or injury and its potential severity. With respect to Dr. Weisberg's initial claim for disability in 2013, there is also a dispute regarding whether Dr. Weisberg experienced the 20% drop in income necessary to qualify for residual disability under the Guardian policy. And, Dr. Weisberg does not even seek summary judgment with regard to his

breach of contract claims related to Guardian's denial of his claim for total disability, openly admitting that questions of material fact exist regarding whether Guardian properly denied that claim. *See* Doc. 62 at 1. Given the extremely high threshold necessary to establish a bad faith claim under Alabama law, the fact that the court cannot grant summary judgment on any of Dr. Weisberg's breach of contract claims strongly indicates that an arguable basis existed for Guardian to deny those claims. *See, e.g.*, *Brechbill*, 144 So. 3d at 255 (explaining that for "a plaintiff to survive a motion for summary judgment on a 'normal' bad faith claim, his underlying breach of contract claim must be so strong that he would be entitled to a preverdict judgment as a matter of law") (citing *Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1155 (Ala 2001)).

Further examination of the record reveals that in 2013,[12] Guardian engaged in an extensive evaluation of Dr. Weisberg's claim of disability. This investigation included the full review of all of Dr. Weisberg's provided medical records by at least two physicians, one of whom was an ENT specialist. Docs. 49 at 13–15.[13]

---

[12] Although evidence of Guardian's treatment of Dr. Weisberg's appeal is not properly before the court, the evidence reveals Guardian conducted a similarly thorough and extensive investigation that culminated in the denial decision. *See* Doc. 63-5 at 2–13.

[13] The undisputed evidence establishing the extensive investigation into Dr. Weisberg's claims twice conducted by Guardian provides an independent reason for denying his bad faith failure to investigate claim. Indeed, Dr. Weisberg has not argued that Guardian's investigative efforts into his disability claims were flawed or otherwise undertaken in bad faith, and he has not presented any evidence to that effect. Accordingly, with respect to his bad faith failure to investigate claim, Dr. Weisberg is unable to meet the conditional fifth element of the action that "the

As extensively discussed above, the medical records and testing performed by Dr. Weisberg's own physicians provided fluctuating results and often indicated that Dr. Weisberg's hearing was within normal ranges. Doc. 41 at 8; Doc. 53-22 at 2–3. Based on their review of these records, Guardian's physician reviewers, Dr. Arts and Dr. Holbrook, found that there was no indication of an auditory impairment, and, even if an impairment existed, it would not impact Dr. Weisberg's medical practice. Docs. 49 at 13–16; 53-38 at 3; 53-32 at 17.

Alabama courts have made clear that "[w]hen a claim is 'fairly debatable,' the insurer is entitled to debate it." *Davis*, 604 So. 2d at 358. Here, Guardian has put forward substantial evidence indicating that at the time it denied Dr. Weisberg's disability claims an "arguable or debatable reason" to deny his claim existed—namely the conclusion of several doctors that Dr. Weisberg was not injured, and, that even if he was injured, those injuries were not significant enough to cause any reduction in income. *See, e.g.*, *Bailey*, 2015 WL 1883725 at *8 (finding that because "several health experts" had indicated that the plaintiff was not disabled summary judgment was appropriate on bad faith claim). Therefore, because all that is required for the insurer to defeat a bad faith claim is an arguable or debatable reason to deny the claim, not a showing that the decision to deny benefits was correct, *see Brechbill*, 144 So. 3d at 257, Guardian is entitled to

---

insurer[] intentional[ly] fail[ed] to determine whether there [was] a legitimate or arguable reason to refuse to pay the claim." *Brechbill*, 144 So. 3d at 257.

summary judgment as a matter of law with respect to Dr. Weisberg's bad faith failure to pay and bad faith failure to investigate claims.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Dr. Weisberg's Motion for Partial Summary Judgment, doc. 41, is **DENIED** and Guardian's Motion for Partial Summary Judgment, doc. 49, is **GRANTED**. Accordingly, the bad faith claims (counts two and three) are **DISMISSED WITH PREJUDICE**. As to the breach of contract claim (count one), this matter is **SET** for a pretrial conference on December 6, 2017 at 11:15 a.m. in the Jury Assembly Room, 4th Floor of the Hugo Black Federal Courthouse in Birmingham, Alabama. The court directs the parties to the Standard Pretrial Procedures governing all pretrial deadlines which is attached as Exhibit A. The trial is **Set** for January 22, 2018 at 9:00 a.m. in Courtroom 4A of the Hugo Black Federal Courthouse.

**DONE** the 24th day of October, 2017.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE